Good morning, may it please the court. My name is Jim Thur and I represent Mr. Moody. The issues before the court today are whether the trial court erred in denying Mr. Moody a Franks hearing based on testimony that was only made available to Mr. Moody at trial. Specifically the testimony of Detective Schelke of the Portsmouth Police Department and the testimony of Alexandra Hogan who was a confidential informant. Only at trial did it become obvious that there had been material misrepresentations by Detective Schelke in her search warrant affidavit that were essential to the finding of probable cause. Those misrepresentations included that contrary to what she had sworn to the magistrate, Mr. Moody did not sell narcotics in 1212 Lindsay Avenue because he did not meet people at the house. That there had been no controlled purchases from 1212 Lindsay Avenue. There had not been even a controlled purchase, singular, from that address. That no informants had seen cutting agents, scales or guns at Lindsay Avenue because there had been no controlled purchases there. That Mr. Moody was not observed leaving Lindsay Avenue to travel to Ms. Hogan's location on March 24, 2016. That he was not present when Ms. Hogan purchased heroin on March 24, 2016. And that any confidential informant who had stated anything to the contrary of those statements lacked reliability because Detective Schelke knew they weren't true. And that is the crux. The fact that the detective, the affiant, upon whom we must focus in determining whether Frank's hearing is required, not until she testified did it become clear that she knew her statements were And really what I'm trying to focus on here is the question, independent of all of this, of what is actually required to get a Frank's hearing. And you say here, you know, the preliminary showing that need not establish the required center, right? And so, and that's been, was my experience in this and the cases that I've read seem to suggest that. That all that's required is you've got to show that it's actually false. And so Frank's talks about the supporting statements of reasons for why it's false. And then you've got to show that it was material, right? It can't be, you know, that they misspelled somebody's name. It's got to be something that matters. But if you do make those two showings and then merely allege that it was either intentional or reckless, you don't have to have evidence of that in order to get a It's accurate. The issue though is, you know, the defendant has to make a substantial showing. Of what is the question? Well, under this court's formulation in white, that it's a false statement and that it's knowing intentionally or with reckless disregard for the truth made and necessary for finding a probable cause. So the issue is to make a substantial showing of intentional falsity or reckless disregard. You can't simply say, I think the detective lied. And you can't simply... Because if that's true, you almost never are going to have Frank's hearings, right? Like every Frank's hearing that you can think of is brought about to inquire, to determine. That's why it's a hearing, not a determination about whether the false statement was material and whether it was intentional or reckless disregard of the truth, right? I mean, if the standard really requires evidence, and this is what seems hard to me, is if you must show evidence of intentionality in order to even get the hearing, that seems like an impossibly high bar for defendants to get the Frank's hearing. And so yes, that may help your client in this particular case. But if that's the standard that we're setting, it means that almost no other client that you will have will ever get a Frank's hearing. Your Honor, I would welcome this court lessening the requirement for defendants to get Frank's hearings by lowering the substantial showing they must show for intentional... I'm not trying to change it. What I want to know is, in your view, is that true? Do they have to make a substantial showing based on facts that it was intentional? Yes, it is, Your Honor. And I think Tate proves that. This court's opinion in Tate, where you had the police officer who went into the locked backyard to search trash cans that were not abandoned. And if you look at the showing that the defendant in Tate had to make, he had to present evidence to show that there was no way for that police officer to get into that backyard without trespassing. Because it wasn't the trash day when he went, the gate was locked, the person who lived in the house who was charged with the chore of the trash testified that he never put the cans out until the day of the trash collection. That showed the intentional misrepresentation and the reckless disregard. So that's what, when I read Tate... And they had intent... I don't recall the specific facts of Tate. What you're saying is they had to show all that before the court granted a hearing or in the hearing? No, those were all affidavits and evidence presented with the Franks motion. And the Tate court said, but for those showings, a Franks hearing should not have been granted? No, Your Honor. I'm not making that representation. What I'm saying is when this court looked at the record in Tate, it approved of that evidence as setting forth a substantial showing necessary. Surely, that's just saying that if you do have evidence of intentionality, that's really great. The question is whether it's required. Well, Your Honor, I'm not aware of any case where this court has upheld a Franks hearing where a defendant has not made a substantial showing through evidence or a proffer that goes to intentional misrepresentation or reckless disregard. It's not enough simply for the confidential informant is lying, therefore the detective lied. Because as we know, if the confidential informant lied to the detective, that's not enough. The detective is not required to verify that everything the confidential informant says is true. What matters is whether the detective, in receiving that lie, knows it to be a lie or has evidence of unreliability of the informant. And that is what the defendant has to show to even get to a Franks hearing. He then, of course, has to develop it to prevail. But the defendant can't simply go forward and say, the detective submitted an affidavit. It's based on a bunch of lies from the confidential informant. Well, that fails because there's no substantial showing there of intentional misrepresentation, reckless disregard, or material omission. Because the detective is fully entitled under the law to rely upon confidential informants as long as they have evidence of reliability. So the defendant has to do more. Now, in this case, Mr. Moody, when looking at the affidavit, he has nothing to challenge those representations. Because if confidential informants have told the police that they've gone to 1212 Lindsay Avenue and purchased narcotics, you're not going to get a Franks hearing for that. How do you do that? First, you don't know who the confidential informant is. So how do you get an affidavit from the confidential informant or get evidence to submit with a Franks hearing motion to make this substantial showing? You just can't do it. So in his case, until he got to trial and until Hogan and Schelke testified, only then did it on everything that was important and was essential to a finding of probable cause. But he had to know from the first time he read the affidavit, which was some months before trial, that he disagreed with the factual representations that were made, each and every one of them. And he didn't need any further evidence to know what he knew. I agree with you, Your Honor. The problem is that doesn't get you a Franks hearing. I mean, this court's jurisprudence is a defendant cannot simply come forward and conclusorily represent in a motion for a Franks hearing that the affidavit contains material omissions or that it contains material misstatements. He's got to make a substantial showing. So under that scenario, what does my predecessor do? He files a motion with a proffer that his didn't meet anyone there to do so. He didn't travel to meet Ms. Hogan on March 24, 2015. But he doesn't have any knowledge about the officer's lie. He had no knowledge. So if my predecessor had presented that Franks motion to the court, I predict it would have been denied because he would have failed to make a substantial showing as required by this court's jurisprudence, and the Supreme Court of the United States, to justify a Franks hearing. So the problem is you have a situation here where the defendant is under this obligation to make a substantial showing, but he's denied the evidence until trial to do it. So your whole argument and our whole discussion with you goes to the timeliness. Well, Your Honor, it does. And if I may address that. So even if it was timely, was it error not to grant a Franks hearing? It was, Your Honor, but it was... I'm sorry, if you need to say more, I just wanted to... your time was running out. Yes, ma'am, I appreciate that. I wanted you to have a chance to... Yes, so the issue of the timeliness, we've addressed that. The issue of the standard, I contend that... I don't know that you have, because your motion came somewhat after the trial, and it would have been clear at that time that if Mr. Moody needed further evidence, he got it when there was testament. But yet there was no motion at trial, and you waited until much later. Well, he waited two weeks, the two-week deadline for a Rule 29, Rule 33 motion. Now, I would address that by saying Rule 12, by its expressed terms, deals with pretrial motions. It says that certain motions have to be made before trial if the information is readily... is readily available, reasonably available. Well, here, the information was not available before trial. So I would contend that Rule 12 has no application here. Rule 12... So he could have just raised it on appeal? Absolutely not, Your Honor, because under Rule 29 and 33, he's got to make any post-trial motions within two weeks, which is what he did. Why was it required to be made post-trial? Because... Under Rule 12, right, you've said Rule 12 doesn't apply. You don't have to make these motions now in the district court. The reason why you have to make it within two weeks is because if he wants adjustment of acquittal or a new trial, he has to make that within two weeks. And the basis for his request for a Franks motion was that this information should not have been presented at trial. And it was. Without it, there was not sufficient evidence to convict on counts 1 through 5. He was acquitted on 6 through 15. And as a result, he should either get an acquittal or get a new trial. So, I mean, the rules, the criminal rules, they permit, they encompass this procedure. It's pretrial if it's readily available. If it's not, then you are left with raising it at trial. He could have done that. He did not. Or doing within two weeks through a Rule 29 or 33 motion. Yeah, but in this case, the affidavits done in the plural, I mean, it's not just the one, I forget what the woman's name was, that the discrepancy came about with. But that's not the only witness. It's not the only... You mean a witness for the search warrant, Your Honor? Right. What was the woman's name? Shelke, Your Honor. No, she did both affidavits. The confidential informant that the controversy is about. Right. But there were other confidential informants. Were there, Your Honor? That's what the affidavit says. Yeah, but there's no evidence at trial. Why would the government put on any evidence of that? There was no contest about that. Well, here's the point, though, Your Honor. The effect of Shelke testified that he would not meet them at the house. So in her affidavit, she says there were confidential informants who went up to and inside 12th Ave. Lindsay Avenue, purchased narcotics, observed cutting agents, scales, and guns. At trial, she testified that Mr. Moody would not meet people at the house. Well, then she corrects that like a couple of pages later, right? Oh, no, Your Honor. Not in your opinion. Your opinion, that's like an absolute. If she said absolutely, nobody ever met at the house. That's what she testified to, Your Honor. That was on direct. That's on cross. That was elicited from the government. And that completely undercuts the statement in the affidavit that confidential informants went up to and inside 12th Ave. Lindsay Avenue, purchased narcotics, and observed drug paraphernalia and guns. So, and Hogan testified she never went to the house. There was no evidence at trial to support those statements in the affidavit. And in fact, the evidence at trial contradict the statements in the affidavit. And not until trial was that information made available to Mr. Moody. So, I believe the standard here is clear error on factual issues and de novo on the legal because this is, this was a Frank's hearing request that was made in a timely manner under the rules. And I've run out of time and I would say the remainder of my time for rebuttal. Thank you very much. Good morning, Your Honors. May it please the court. Despite multiple extensions of the pre-trial motions deadline in this case, there was not a hint before trial began or indeed until well into the trial that the defendant would ever contest the sufficiency of the affidavit in support of the search warrant. How would the defendant know that your witness, the defendant knows he wasn't there? She wasn't. The defendant, he wasn't there, right? The defendant is a he. Correct. That's why. Okay, thank you. The defendant knew that he wasn't there, right? I mean, that's, that's your facts. But the defendant didn't know that your witness lied, misrepresented what the witness said. There's no way he knows that before trial. So, there are two responses. I want to address what the defendant knew and then I want to address at some length, if the court will permit, whether or not there was a misrepresentation here because there is a chasm between the government and my friend on the other side about whether anything untoward happened. Well, I understand that, but I don't understand exactly how that goes to timing. So, let me start with what the defendant knew. So, this court's precedents in Wilson, Rico, and Rue say the defendant has an obligation to inform his counsel of any colorable basis for a suppression motion. If the court looks at the government supplemental appendix, the post-trial motion for a Frank Searing is concerned essentially with one alleged misrepresentation, which is Detective Schelke writes in her probable cause affidavit that two black females and the defendant exited the residence of Lindsay Avenue and then went to deliver narcotics to the confidential informant, Alexandra Hogan. The defendant, I think a fair reading of this court's precedents in Wilson, Rico, and Rue stands for the proposition that if the defendant was not there with those two women, he had an obligation to inform his counsel of that. And then if counsel had wanted to make a pre-trial Frank's motion as Rule 12 requires, the defendant could have authored an affidavit and submitted it to the court, and under the Supreme Court's 1968 case in Simmons, those statements couldn't be used against him at trial. And I think many district court judges, had that occurred, would have convened a Frank Searing. Now, strategically, many defendants will not author those kinds of affidavits or offer to testify to later that they perjured themselves, but I think this court's precedents require a defendant to inform his counsel of that fact and to try to make a showing to the court. There's another reason that answer the question that I asked your counsel before, right? So there's a question of what showing has to be made. The question I've got is does there require proof? So did that affidavit need to include some proof or need to be some evidence, right? Or offer of proof, actual proof, not conclusion, of the mental state of the agent? I agree with counsel for the defendant. There has to be a substantial showing of either intent or reckless disregard. And what does that mean is substantial? I mean, it just seems like to me this is this case sort of, well, one part of this case sort of turns on this question about whether we're required, whether a district court is required to make a defendant have an actual showing of the mental state. And you agree they do. I do. Now, I want to be clear. The way these cases are litigated in federal criminal district courts is often out of an abundance of caution and to protect the record on appeal. A district court may well convene a Frank's hearing when the substantial showing is not particularly strong, but at that point the egg is scrambled. And when it comes to this court on appeal, the court will be reviewing the record from the Frank's hearing and any decision about suppression that the court made. So the government would never be in a position to argue that the hearing never ought to have occurred. So then maybe that's the secondary question. So Frank suggests that you must have a hearing in these circumstances where you make a showing of all three things, falsity, materiality, and mental state, right? But what I hear you suggesting is that the district court has well within its discretion to grant such a Frank's hearing when only two of those are shown, falsity and materiality. I don't think as a matter of doctrine, Your Honor. I think as a matter of actual practice in trial courts, many district court judges will grant these hearings when the substantial showing is not perhaps overwhelmingly persuasive. But you don't make the assertion that they are required to, or that there's no need to make the case. You've just told us there is need. Absolutely. I want to return Judge Motz to the issue of notice. So the first thing is. Well, but wait, before we go to that, but Judge Motz's point is there's not a need to, but you agree that the district court has the authority, the discretion to have a Frank's hearing absent such a showing. Not as a matter of doctrine. I don't think this court's cases say that. I just think that oftentimes the court will convene these hearings and then we are not in a position to appeal the fact that the hearing occurred. The issue on appeal after a Frank's hearing would be whether suppression was appropriate or not. But you think that would be a legal, you think it's an acceptable, you're not fighting it, but it's a legal error for the court to have a Frank's hearing without that showing. Under the existing doctrine of this court, yes, I think it would be. To return to the notice point, this court's precedents require the defendant to notify his counsel of a colloquial basis for a suppression hearing. Whether the defendant was present- You're basing that on Rue and the cases that follow that. Correct. Proceeded, Wilson and Rico, that's correct. So the defendant, if he wasn't present with those two women to deliver narcotics, he had an obligation to his former counsel. But there's another reason that notice here occurred pre-trial, which is there's a second probable cause affidavit in the case. Detective Roche authored the affidavit in support of the criminal complaint in federal court. That affidavit, too, says that there were multiple controlled purchases between October 2015 and March of 2016. But it does not mention the defendant leaving the residence on the evening of March 24th. Now, defense counsel clearly knew about that because he called Detective Roche as one of his own witnesses and then asked him questions about it. So between the defendant's own memory and a purported discrepancy between the Schelke affidavit and the Roche affidavit, the defendant had two reasons that this could have been pursued pre-trial and did not. I want to turn to whether or not there were any misrepresentations here at all, because the government believes that there were. Last question, and then I want you to talk about that, too. But what you're saying is this required element of mental state, the best evidence you've got is this discrepancy between the two affidavits. And the defendant's own memory. If the defendant had submitted a pre-trial... Well, the defendant can't know. The defendant can't know. Let's just assume... All right, take that one off the table. I'm not asking you to concede it. I'm just saying don't talk about it anymore. And so what are the other issues, this discrepancy between the two affidavits? And your argument is, given that they didn't include it in Affidavit 2, that put them on notice that it wasn't accurate in Affidavit 1. Absolutely. Absolutely. Now, I want to turn to the issue of discrepancy here because the government strenuously resists the notion that there was a false or intentionally reckless misstatement. The initial post-trial motion that's filed is about what... Are you going to address the timeliness in the sense that if it was untimely, what's the effect of the untimeliness? I will, Your Honor. If I may, I'd ask just a few moments to address the issue of the lie first, simply because that took up a lot of the time a moment ago. The first purported misrepresentation is that the defendant was not present when the two runners went to deliver narcotics to Alexandra Obian, the confidential informant. In the government's view, a fair reading of the record indicates that that may well have been what the surveillance that was on the house relayed to Detective Schelke. That's at page 292 of the joint appendix, where she says, I was not on the surveillance team. And then she's asked, but that's the information you were given? And she says, yes. So the only thing that appears to be clear from the record is that she was told that the defendant was present. And indeed, when defense counsel... Was present at the sale or present when the two women left the house? Present when the two women left the house. And indeed, when defense counsel then questions Detective Roche on direct examination, the question is never asked. Detective Roche, what were you told by surveillance about who left the house? The defense counsel draws out the fact that it's not in his affidavit, but there's no follow-up question about what the detective knew. So the record in the government's view does not support the conclusion that that was a mistake. The second pivot that defense counsel makes is to assert that because Detective Schelke said at one point that the defendant would travel to other locations, no informant had ever purchased narcotics from inside the house. In the government's view, that is a strained and unfair reading of the record. If the court reviews the part of the joint appendix where that questioning is occurring, which is page 250 in the preceding pages, the government's trial attorney is laying the foundation on direct examination for why the Portsmouth Police obtained a search warrant for both the house and the car. And in the course of a line of questioning about why did you search the car, the detective says, oh, well, the defendant wouldn't deal drugs from his house. He would go to other locations. The question is never asked on cross-examination by defense counsel, are you saying that the statement in your probable cause affidavit was a lie? And in the government's view, as the district court correctly concluded when it denied the post-trial motion for a statement out of context and treat it as an admission of some sort of blatant falsity, it's simply unfair. In addition, both Detective Schelke's affidavit and Detective Rocha's affidavit say that multiple confidential informants purchased narcotics between October 2015 and March 2016. There is no information in the record at all, one way or another, about that fact. A moment ago, Mr. Thorne said something that really reveals what's the government never put on evidence to back up its statements in the affidavit. But of course, absent a pretrial motion, the government's trial attorney has no reason to believe that probable cause is an issue in the case at all. And so what the government did here was craft a very narrow indictment based essentially on the testimony of one informant, Alexandra Hogan, and the search on March 24, 2016. So the notion that post-trial, the absence of evidence can be used to indicate that there were lies is simply not the way criminal trials actually occur. What's more, the record here is actually clear that there was at least one more informant, and that's Sarah Breen. There are multiple references to Ms. Breen throughout the record. She is described as a woman who worked and signed up as an informant with police but was never used. But importantly, I would direct the audience to pages 167 and 183, because at those two pages, Detective Monteith explains that while Sarah Breen was never used as an informant, she sat with police before the search warrant was executed and helped police draw a diagram of the interior of the Lindsay Avenue residence. So at least one person who had signed up with an informant had been inside the home and, in fact, explained what the layout of the home was to police. So we know there are at least two informants, and as to whether, or let me back up a step, on the issue of whether there were additional informants even still beyond Ms. Hogan and Ms. Breen, the record is simply silent. And this Court's precedents again and again say that a Franks hearing will not lie based on supposition or conclusory statements. And the assertion that there were no informants who bought narcotics in the house between October 2015 and March 2016 is just that. It's supposition and conclusion. Now, Judge Agee, I want to turn to the question of timeliness. This Court's most recent precedent on the issue of timeliness in Franks hearings is the White opinion from a few years ago. This case is distinguishable from White in three ways. The first is when the motion was made, in White. It was made during trial. It was made during trial. That's exactly right, Judge Motz. It was made as soon as it was clear. But it wasn't made pre-trial. That's correct. And your argument is that it should have been made pre-trial. Correct. But just as an opening proposition, for timeliness to have any legs at all in this case, the Defendant's Trial Council had an obligation after the cross-examination of Detective Schelke to say, Your Honor, we need to pause here. I need to move for a Franks hearing. I believe it's now clear that a false statement was made. That never happened. Indeed, I've said multiple times that— You've accurately recounted the facts of White. Do you have another case that says that? RICO. So RICO is a case in which there was an allegation that the government agents had improperly turned the defendant's employee into an agent. And there's no motion made for suppression until after trial. But it's not a Franks hearing. It's not, but in our view, a Franks hearing is in the nature of a suppression motion. But it's not exactly. I mean, it's a whole different body of law that's developed. But I take your point. Right. And I just simply wanted to say, Your Honor, that in RICO, when explaining why the motion for suppression was not timely, the Court specifically says, if anything, you ought to have objected to this during the—or following the testimony that allegedly put you on notice, but you waited until after trial, which is especially untimely and inimicable to the interests of justice here. And so to put RICO next to White, we think, stands for the proposition that if, indeed, there was some revelation mid-trial during the questioning of Detective Schelke, defense counsel had an obligation to object then. Now, at that point, we would have argued there was no mid-trial revelation. This is both unavailing on the merits and untimely because it ought to have raised before. But having not made that objection mid-trial, there's simply no basis in this Court's precedence or under Rule 12 to hold that he can wait until two weeks after the jury has reached its verdict. Was there any substantive difference for Rule 12 purposes as to whether the objection that could have been made in trial as opposed to what happened in this case a couple of weeks later, does that really make a difference? Because in neither case has it come pre-trial. Our view— There's a factual difference between the cases. I understand that. But— The answer is yes. Our view is that the Court ought to hold—we've articulated this position in our brief—that the good cause requirement of Rule 12 essentially serves a gatekeeping requirement. So the easiest way, we think, to reconcile White with that position is to simply say that on the facts of White, there may have been good cause for waiting until mid-trial because the defendant was not actively on notice. Well, that's a way to distinguish White, to be sure, but I'm not sure that exactly reaches Judge Agee's question. Well, and so our position would be, absent a showing of good cause, the defendant ought not to be able to make a suppression argument that wasn't made pre-trial. Right. But White doesn't hold that. But our view, Your Honor, is—as I said, we think if we go alongside White, it's a line that runs through the Court's precedence. You would have to derive that from the Rule plus case law. That's correct. So our initial argument is, because there was no Frank's motion or motion for suppression pre-trial, and no good cause shown for the delay, it's waived and there's no reviewability on appeal. If the Court were to conclude that there was something revealed during the testimony of Detective Schelke, then this case looks more like White. So if it's waived, then that's the end of it. Correct. That's our view. And that's the view of the Ninth Circuit, the Tenth Circuit. The Ninth Circuit split on whether it's waived or whether you review in that circumstance for plain error. Right. In the Rue case, the Court concluded in the opinion it's untimely. Stop. And then when you look at a footnote later on, it says, appellate says that we're able to review it for plain error, and we find, though, a lono error here. It says a sentence or two after that. The Court never really says, well, we adopt a rule for plain error. That's what they did in that case. Exactly. So that's footnote 7 in the Rue. And our view of this Court's doctrine is, the Court has continued to straddle that question, both before and after the 2014 amendments to Rule 12. And in view of the existing circuit split, the government's urging to the Court is to join- So why do you say there's no plain error here, then? There are a few reasons. Obviously, the government would win if the Court were to hold that there were no plain error and the conviction would be affirmed. But adopting a more stringent version of Rule 12 has any number of salutary consequences for the administration of justice and efficiency. Right. Well, let's assume we want to continue to straddle there. So tell us about plain error. Well, the first question in plain error is, was there an error? And in our view is, there was not. There would only be an error if there were a clear indication made that there was either an intentionally false or a recklessly false statement in the affidavit that was material. And in our view, the District Court correctly concluded that the defendant had made none of those showings, even having waited until after trial to make the motion. Can I ask a- you're almost out of time, and I hate to end with this, but I just have a couple of factual questions to make sure that I understand sort of what happened. Can you tell me when the control by happened? Like, what time of day? Uh, I don't have it at my fingertips. It's in the evening. So let me ask a different question, maybe sort of back into it this way. Do you know whether the testimony of Detective McCoy, where he described surveillance, is that before or after the buy? So our understanding is there's surveillance at both times. Right, but the testimony at JA-37, and you may- listen, I'm totally comfortable if you say I don't know, right? I'm not trying to get you to take a position on something. Okay, so on page 37, McCoy testifies about some surveillance, and he says 7-15. He later corrects that to say 5-15 a couple pages later, but the question is whether this surveillance that's being described here, is this happening before the buy or after the buy? I think, although the record is not clear, and I'm viewing this in the exact same position as the court from the cold record. I think this is after, and the reason I say that is it's not the same incident because there's only one female exiting with Mr. Moody. Although there's some suggestion that there's confusion about whether there's one or two. Well Detective Roche says later when he's questioned by defense counsel that surveillance told him there were two. There were two, okay. But so, and the other reason to think that is that the affidavit submitted to the judge at 6-01 p.m., and it would be really hard for them to be going to the buy at 5-27 and then get the affidavit there at 6-01. Which is why I think it's late. Okay, alright. But Detective Shelke's testimony also, as I mentioned, at 2-92, she indicates that there's surveillance on the house as they're leaving. Both sides. I just wanted to make sure that I understood that the McCoy was the after, not the before. Yes, Your Honor. Both because the motion wasn't timely and because it's unavailing on the merits, the government urges this court to affirm the conviction. Thank you very much. Thank you. You can go ahead without the light. Can you start just by telling me, in the post-trial motion that is made, I don't see it's part of the appendix. The government filed a supplemental appendix, Your Honor. Okay, maybe it's in, that's fine. You don't need to get it. The question I've got is, what precise statements were challenged there as being false? Your Honor, and as the government has conceded, and they did this in page 38 of their brief in footnote 4, there were two statements challenged in the post-trial motion. One, that Mr. Moody dealt from the house. He met people at the house. Two, that he had traveled from the house to meet Ms. Hogan on March 24, 2016 to consummate the heroin transaction. And had been there for it. Yes. Okay. I'd like to talk about RUA for just a minute. There's a difference in RUA that we don't have here. If you remember the facts in that case, in the pretrial exhibit list, the government had disclosed that they had obtained documents from this third party. And what the trial court held was that once the defense counsel had gotten that pretrial exhibit and seen that these documents had been obtained by the government through a third party, triggering the suppression motion, that's when he had the obligation to move for the Frank's hearing. Pretrial. That's why Rule 12 was implicated. We don't have that here. We don't have here where that evidence, that evidence of Detective Schelke's falsity was available pretrial in any context. That evidence was only available when she took the stand and testified. On Detective Roche, I would note that Detective Roche was on the SWAT team on March 24, 2016. He had nothing to do with surveillance or anything else. His subsequent affidavit in federal court is based on Schelke. It's based on the same information. Well, but their point is that accepting that, the fact that it changes, puts you on notice, that somebody figured out, at least the allegation would be, that it wasn't true. And that only goes to the issue of who left the house and went to travel to Hogan. It doesn't go to the issue of the fact that Detective Schelke knew that Mr. Moody did not deal narcotics from 1212 Lindsay Avenue. That's not encompassed by the Roche. Right. Okay. I get you. I understand. On Sarah Breen, I would note, she was never used, so she was obviously not involved in any controlled purchase from 1212 Lindsay Avenue. So yes, Sarah Breen is mentioned in the trial transcript. She was present at the house when the search warrant was executed. But by the government's own evidence, she was never used as an informant. She never performed any controlled purchases. Yet, Schelke alleged that controlled purchases were made from the house. Again, that's false. And that's a material misrepresentation that would mislead the magistrate in determining that there was probable cause to issue a search warrant for 1212 Lindsay Avenue. RICO doesn't stand one way or the other on the issue of when the motion should be made if the evidence doesn't come forward until trial. In RICO, the issue was the search was conducted, items were seized from the defendant in his presence in his house. And the defendant argued, well, my attorney didn't know that. And so my attorney didn't know to make the motion. That was the issue in RICO. That's not the issue here. We're not saying there's an issue between knowledge of the defendant versus knowledge of the attorney. Here, the issue is the knowledge for both only arose once trial occurred. And because of that, the standard that this court should apply is the standard that applies to all Franks hearings and the denial of Franks hearings. And that is review of the factual determinations for clear error and review of the legal conclusions de novo. And I will note that the trial court, in its opinion, completely ignored the issue that Detective Schelke had testified, that Mr. Moody did not meet people at the house. Trial court didn't analyze it. It's not in his opinion. That's in the joint appendix. That was completely ignored. The trial court focused on whether Mr. Moody had left the house, had gone to meet Schelke, had gone to meet Hogan on March 24. Do you have anything further to say to us about timing in the distinction that the government's made between this case and White? Yes, Your Honor.  It would have been preferable for the trial counsel to raise this immediately at trial. But I think that since this was not available until trial, Rule 12 simply does not apply to the question before the court. So the question before the court is, does Rule 29 and Rule 33, with its 14-day post-trial motion limit, does that provide for making a Franks hearing request when the information is not available until trial? Can I ask? Sure. Might I please apologize to do this, particularly on a Thursday. So the question I've got, and I asked this briefly earlier, and you said no. Schelke says something about that he wouldn't meet people at the house, but would go to different locations, which is true, but the question is whether it's exclusive. Then 10 pages later, she's testifying, and she talks about the heroin. And she says, that's what my dealings were with the purchases we made from the house. So she describes, I mean, you could read, and I accept that maybe it seems aggressive, but maybe you could read JA 250, that he would, it doesn't say only, but you could read it as saying he would only go to different locations. Because everybody acknowledges he would go to different locations. The question is whether that's the only thing he would do. But the ambiguity there seems to be resolved by JA 260, where she says, the purchase we made at the house. The purchase we made from the house, she says. Yeah, from, at, whatever. I think when you look at the context of the colloquy, that was with the court. Judge Morgan was questioning her because he was trying to clarify something. That colloquy was dealing with the March 24, 2016 control buy by Hogan. And I believe that when you look at that statement in context, the court is clarifying what happened that day. And that could, the purchase we made from the house, I believe is Schelke referring to the purchase Hogan made when she called, and she ultimately purchased narcotics away from 12th of Lindsay Avenue. And Schelke was associating that with the narcotics came from the house to go to that transaction. That's my reading of your honor. I concede it's unclear. But she didn't say purchases, I'll note that in her testimony. It wasn't plural. She talks about purchase we made from the house. She doesn't say purchase we made at the house. And I believe in the context of the testimony, she's referring to the March 24, 2016 Hogan transaction. If there are no further questions, I thank you for the extra time. No, we thank you very much. I have to tell you that this is one of the best arguments I've heard from both of you. You really did a fine job. You got some tough questions. I appreciate your help. Thank you, Your Honor. We'll come down and break the rules. Do you want to do this? OK, we will come down and get the lawyers and take a short recess. This honorable court will take a brief recess.
judges: Diana Gribbon Motz, G. Steven Agee, Julius N. Richardson